UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

TOBY DIGRUGILLIERS,         )
      Plaintiff,           )
                            )
     vs.                  )         1:06-cv-952-SEB-JMS
                            )
CONSOLIDATED CITY OF       )
INDIANAPOLIS, *et al.*,        )
         Defendants.     )

**ENTRY DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on the Motion for Preliminary Injunction [Docket No. 5] filed by Plaintiff, Toby Digrugilliers, on June 16, 2006.  Mr. Digrugilliers seeks to enjoin enforcement of what he contends is "discriminatory treatment of religious uses in the City [of Indianapolis]'s Zoning Code, in violation of his rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ('RLUIPA')."  Mot. at 1.  On November 3, 2006, we conducted a hearing to receive evidence and hear argument regarding these matters, and, on November 13, 2006, we ordered supplemental filings by Mr. Digrugilliers to ensure that the ripeness requirement of this action has been satisfied. We are now prepared to rule on Plaintiff's Motion, and, for the reasons cited, must <u>DENY</u> Plaintiff's Motion.

**Factual Background**

As summarized in our entry of November 13, 2006 [Docket No. 30], the relevant facts underlying this action are as follows: Plaintiff is the pastor and trustee of the Baptist Church of the West Side, a church located at 6411 W. Thompson Road, in Indianapolis, Indiana ("the Thompson Road property").  Mr. Digrugilliers has brought this action in his capacity as an individual, a member of the Church, the pastor and a trustee of the Church, and on behalf of the Church and its members.[1]

The church has possessed a leasehold interest in the Thompson Road property dating back to July 1, 2005, when it signed a lease agreement with the lessor, Walton Properties, LLC (Joint Ex. I).  Paragraph 6 of the lease provides that "[t]he lessee covenants that the premises shall be used for the purpose of [a meeting facility], and shall not be used or permitted to be used for any other purpose; [and] that said premises shall not be used for any unlawful purpose and no violations of law or ordinance shall be committed thereon."

---

[1] Mr. Digrugilliers is empowered to bring this suit pursuant to the Declaration of Trust adopted by the Church.  Joint Exs. A, B.  Section C.2 of the trust document empowers the trustee to "[c]ommence or defend litigation with respect to this Church . . . or any property of the Trust Estate, as the Trustee may deem advisable," but requires that he "shall first consult the congregation prior to the exercise of" such power.  In our entry of November 13, 2006, we expressed reservations about Mr. Digrugilliers's authority to bring this suit on behalf of his congregation, because, though he had made the trust document and the resolution adopting it a part of the record, he had not demonstrated in any evidentiary submission that he had actually received the explicit permission of his congregation to bring this suit, as required by the trust agreement.  We ordered Mr. Digrugilliers to supplement the record with such evidence, which he did by filing a Supplemental Stipulation of Facts [Docket No. 34] on December 11, 2006.  Joint Exhibit J, attached to the stipulation, is a Resolution of the Congregation of the Baptist Church of the Westside clearly authorizing him to proceed with this litigation at his discretion.

The lease expired on July 1, 2006, after which time it was extended month-to-month, pursuant to the terms laid out in Paragraph 14 of the lease, which provide that a holding over of the lease beyond its expiration operates as an extension of the lease from month to month.  See id.  On December 6, 2006, the parties entered into an amended lease which extends the lease term until December 6, 2007, with a one-year option to renew.   Joint Ex. L.  In addition, the amended lease contains a provision acknowledging the Church's use of the premises as such:

> Lessor acknowledges that Lessee is using the premises as a meeting facility for divine worship, and hereby consents to such use.  Lessor further acknowledges that Lessee is a plaintiff in [this lawsuit] . . . Lessor hereby grants to Lessee, as part of its leasehold interest in the Premises, the right to maintain the Lawsuit against the City and assigns to Lessee any cause of action and any right, title or interest in whatever claims it has or may have as Lessor and property owner against the City related to the Lawsuit and the constitutional or statutory propriety under federal or state law of the City's regulation of religious uses.[2]

The Thompson Road property is located within a "C-1" zoned district under the zoning ordinances of the City of Indianapolis.  A C-1 district is zoned for "office-buffer

---

[2] Joint Ex. L ¶ 4.  This clause addresses the concerns we raised in our entry of November 13, 2006, where we noted that because the adjudication of this cause would have direct and immediate impact on Walton Properties's interests, both as owner of the property and as lessor to the Church, in our view Walton Properties was thus a necessary party to this litigation. Accordingly, we granted Plaintiff additional time to join Walton Properties as a necessary party. In his motion of December 11, 2006, Plaintiff indicated that Walton Properties was unwilling to join the lawsuit voluntarily, and that Plaintiff did not wish to sue his landlord in order to effectuate compulsory joinder.  However, Walton Properties *was* willing to transfer to Plaintiff any interest it had giving rise to its status as a necessary party, via the lease provision cited here. Because it is clear to us that Walton Properties has had appropriate notice and opportunity to protect its individual interests in this lawsuit, we are satisfied that the litigation may proceed without joinder of Walton Properties as a party.

3

commercial" use.[3]  City Code § 732-201.  Permitted C-1 uses are delineated in § 732-

201(a) of the City Code, and include auditoriums, assembly halls, community centers,

certain health services, membership organizations or clubs, mortuaries, any type of office

use, radio and television studios, museums, and certain types of specialized schools.  Id.

Plaintiff stipulates that the Church is engaged in religious land use at the

Thompson Road property.  See Joint Stipulation ¶¶ 8, 9, 24.  Religious uses[4] are not

permitted as of right in a C-1 district.  A religious use would be permitted at the

Thompson Road location if the Board of Zoning Appeals ("BZA") were to grant a use

variance, pursuant to the Rules of Procedure of the BZA (Joint Ex. E) and the statutory

criteria enumerated in the Indiana Code,[5] or if the land were rezoned as an SU-1 district (a

---

[3] The purpose of a C-1 district, as described in the City Code, is:

> to provide specific areas where office uses, compatible office-type
> uses, such as medical and dental facilities, education services, and
> certain public and semi-public uses may be developed with the
> assurance that retail and other heavier commercial uses with
> incompatible characteristics will not impede or disrupt this district's
> function as a buffer.

City Code § 732-201.

[4] Religious use is defined in the City Code as:

> a land use and all buildings and structures associated therewith
> devoted primarily to the purpose of divine worship together with
> reasonably related accessory uses, which are subordinate to and
> commonly associated with the primary use, which may include but
> are not limited to, educational, instructional, social or residential
> uses.

City Code § 731-102(152).

[5] Indiana Code §36-7-4-918.4 provides that:

> A board of zoning appeals shall approve or deny variances of use

(continued...)

4

special use district dedicated to religious use).  <u>See</u> Joint Stipulation ¶ 11.

On February 6, 2006, the Church was notified by letter from the City of Indianapolis that it was in violation of the City Code by virtue of its conducting an activity not permitted in a C-1 district (Joint Ex. F).  Walton Properties, LLC, received an identical letter (Joint Ex. H).  Plaintiff was informed by a zoning official that the Church must apply for a use variance to the zoning ordinance if it wishes to continue operating in its present location.  Pl.'s Br. at 3.  However, Plaintiff indicated to the zoning official that the Church is unwilling to apply for a use variance due to the "burdensome and costly nature of the application process."  <u>Id.</u> at 4.  Plaintiff argues that, by requiring the Church to undergo this variance process while functionally similar nonreligious uses are entitled

---

[5](...continued)
from the terms of the zoning ordinance. The board may impose reasonable conditions as a part of its approval. A variance may be approved under this section only upon a determination in writing that:

(1) the approval will not be injurious to the public health, safety, morals, and general welfare of the community;

(2) the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner;

(3) the need for the variance arises from some condition peculiar to the property involved;

(4) the strict application of the terms of the zoning ordinance will constitute an unnecessary ardship if applied to the property for which the variance is sought; and

(5) the approval does not interfere substantially with the comprehensive plan adopted under the 500 series of this chapter.

to locate in C-1 zones as of right, the Zoning Code unduly burdens religious practice and expression.

Plaintiff brought this action against the Consolidated City of Indianapolis, the Metropolitan Board of Zoning Appeals of Marion County, and the Department of Metropolitan Development of Marion County – Division of Compliance (collectively, "the City"), asserting that the City's Zoning Code violates the First and Fourteenth Amendments to the U.S. Constitution (both facially and as applied to him), the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and Article I, Sections 2 and 3 of the Indiana Constitution.  However, the preliminary injunction sought by Plaintiff is confined solely to his challenges under the U.S. Constitution and RLUIPA, whereby he seeks to enjoin "enforcement of the discriminatory treatment of religious uses in the City's Zoning Code."  Mot. at 1.

## **Legal Analysis**

### *I.      Standard of Review*

The preliminary injunction sought by Plaintiff is "an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved."  <u>See</u> <u>Indiana Civil Liberties Union v. O'Bannon</u>, 259 F.3d 766, 770 (7th Cir. 2001).  The Seventh Circuit recently articulated the standard for granting a preliminary injunction as follows:

To win a preliminary injunction, a party must show that it is reasonably likely

6

> to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. . . . If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis . . . which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.

Christian Legal Society v. Walker, 453 F.3d 853, 859 (7th Cir. 2006).

In Joelner v. Village of Washington Park, 378 F.3d 613, 620 (7th Cir. 2004), the Seventh Circuit noted that "[w]hen a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor," because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. . . and money damages are therefore inadequate. . . . Concomitantly, there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties."  See also AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002) ("A party with no chance of success on the merits cannot attain a preliminary injunction.").

## II.    *Likelihood of Success on the Merits*

### A.    *Plaintiff's First Amendment Claims*

Mr. Digrugilliers contends that the Zoning Code violates his constitutional rights under the First and Fourteenth Amendments.  We examine first his claim that the Zoning

7

Code infringes upon the Church's right to free exercise of religion and freedom of speech as guaranteed by the First Amendment.

1.      *Free Exercise Clause*

Our inquiry under a free exercise framework requires an examination of "whether the law being challenged is 'neutral and of general applicability.'" Vision Church v. Village of Long Grove, 468 F.3d 975, 996 (7th Cir. 2006) (quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993)).  If a law is not neutral and generally applicable, it "must be justified by a compelling government interest and narrowly tailored to advance that interest." Hialeah, 508 U.S. at 531.  But, if a law is neutral and generally applicable such that the burden it places on religious exercise is solely an incidental effect, the regulation need not be justified by a compelling state interest.  See Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 763 (7th Cir. 2003).

Mr. Digrugilliers maintains that the Zoning Code is neither neutral nor generally applicable.  The Zoning Code does not permit religious use as of right in C-1 districts, but does permit as of right what Mr. Digrugilliers contends are "operationally similar uses [such as an auditorium, assembly hall, community center, museum, etc.] that possess no functional distinction from a religious use."  Pl.'s Br. at 8.  Mr. Digrugilliers contends that because these "exceptions" are permitted uses in a C-1 district while religious uses are *not* permitted, the ordinance's failure to allow an exception for religious reasons constitutes a

lack of neutrality and general applicability.  Pl.'s Br. at 10-12; see Fraternal Order of Police v. City of Newark, 170 F.3d 359, 365-66 (3rd Cir. 1999) (finding that a police department "no-beard" policy violated the free exercise clause when it provided medical exemptions to the policy, but not religious exemptions).

The City responds that the Zoning Ordinance is neutral, generally applicable, and otherwise valid.  The Zoning Ordinance regulates both religious and non-religious uses, and there is no evidence that the City's purpose in regulating religious uses is anything other than as stated in its general zoning ordinances.  The City analogizes Mr. Digrugilliers's claims to those brought by the plaintiffs in Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752 (7th Cir. 2003), cert. denied, 541 U.S. 1096 (2004) (hereinafter "CLUB").  The CLUB plaintiffs were Chicago-area churches who challenged the City of Chicago's zoning ordinance (the "CZO") on several grounds, including the First and Fourteenth Amendments and RLUIPA.  Chicago's ordinance permitted religious land use as of right in residential zones, but required religious entities (as well as other nonconforming land uses) to obtain a "special use" variance before locating in a commercial zone – the cost of which (including legal fees, a title search, etc.) often approached $5,000.  Id. at 755-56.

The CLUB plaintiffs argued, as Mr. Digrugilliers does here, that their free exercise rights were infringed by the zoning ordinance.  They maintained that Chicago's refusal to automatically exempt churches from the zoning scheme constituted "religious hardship," triggering strict scrutiny in accordance with Hialeah, which holds that "[i]n circumstances

in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Id. at 764 (quoting Hialeah, 408 U.S. at 537). The Seventh Circuit rejected this argument, noting that the churches had "confuse[d] exemption from a particular zoning provision . . . with exemption from the procedural *system* by which such approval may be sought. . . . [Under the CZO] no person, nor any nonconforming land use, is exempt from the procedural system in place for [variance procedures] specifically, or the [zoning ordinance] generally." Id. The Court continued, noting that "it is neither the policy nor the practice of Chicago to refuse to extend to churches its system of individualized exemptions and, thus, . . . the CZO is a generally applicable system of land-use regulation." Id.

For similar reasons, we find that Mr. Digrugilliers is unlikely to prevail in this litigation on free exercise grounds. Mr. Digrugilliers's argument presumes that certain nonconforming land uses which he claims are "operationally similar" to his proposed use are essentially entitled to an "automatic" exemption from the zoning code, whereas religious uses must undergo an (arguably) arduous process in order to locate in a C-1 district. That reading of the ordinance is quite different from our reading of it. As in CLUB, all nonconforming land uses are subject to the variance procedures, and there is no basis to conclude that nonreligious land uses are treated more favorably in seeking or

receiving a variance than are religious uses.[6]  A person wishing to make residential or industrial use of the land in a C-1 district would be subject to the same requirements as Mr. Digrugilliers; his chosen use is not "singled out" under the Zoning Code.  Because the law is neutral and generally applicable to all who seek a variance, the Indianapolis zoning system does not place an unconstitutional burden on religious exercise.

Mr. Digrugilliers's argument is unpersuasive for an additional reason not raised or addressed in CLUB.  He maintains that the Zoning Code is discriminatory in allowing "operationally similar" land uses to locate as of right in C-1 districts, and that, because these uses (community center, auditorium, etc.) implicate the same traffic, safety, and other concerns as religious uses do, religious discrimination is the only logical explanation for the disparate treatment accorded such uses under the Zoning Code.  We do not accept either this premise or this logic.  Under both Indiana law as well as the Zoning Code, religious land uses implicate land use concerns which the arguably "operationally similar" land uses cited by Mr. Digrugilliers do not.  Section 735-751 of the Zoning Code provides that religious use is defined as land use "devoted primarily to divine worship *together with reasonably related accessory uses, . . . which may include but are not limited to, educational, instructional, social or residential uses.*"  Zoning Code § 735-751 (emphasis added).  Civic clubs, galleries, and museums are not entitled as of right to use C-1 land for such a variety of uses and they would need to apply for a

---

[6] In fact, there are suggestions to the contrary: the City's counsel mentioned during our preliminary injunction hearing that variance procedure fees may be waived in part for religious organizations.

use variance in order to do so, much as the City requires religious uses to do.

Moreover, and perhaps more importantly, a religious land use directly affects the commercial viability of surrounding land by impacting its neighbors' eligibility to engage in certain types of regulated business such as liquor stores and adult bookstores.[7]  Indiana Code § 7.1-3-21-11, for example, mandates that a new liquor sales permit may not be issued for a premises within two hundred feet of a school or church.  Section 7.1-3-21-11(c)(1) provides that a church or school may waive this bar for drug stores or grocery stores, but no provision provides for any waiver for other liquor-selling businesses.  Moreover, liquor permits must be renewed annually (or, in some cases, every two years), pursuant to Indiana Code § 7.1-3-1-3, thus threatening even long-standing permittees with an inability to renew their permits if a school or church moved in next door.  These are significant concerns which attach to religious land uses but *not* to the "operationally similar" uses listed by Mr. Digrugilliers,[8] and thus they provide a substantial – and

--------------------------------------------------

[7]  See Indiana Code § 35-49-3-3 (generally prohibiting the dissemination of obscenity or pornography which is harmful to minors within five hundred feet of a school or church).

[8] Mr. Digrugilliers makes much of the fact that, despite the fact that "schools" also implicate this liquor permit restriction,  the Zoning Code does permit some "schools" to locate in C-1 districts as of right.  In fact, however, the great majority of schools *are* barred from C-1 districts; the only types of schools specifically allowed are business/secretarial, clerical, correspondence, data processing, language, music, nursery, and vocational/technical schools, and junior colleges.  The cited Indiana Code provision does not define "school" specifically, and we could locate no caselaw specifically construing the term as used in the statute.  However, we note that the statutory provision *immediately preceding* the cited liquor permit provision states that applicants for liquor permits whose premises are situated within two hundred feet from "*an elementary or secondary school* or church" must disclose this fact to the commission.  Ind. Code § 7.1-3-21-10.  In addition, Indiana Code § 7.1-3-1-5.5 requires new alcohol permit applicants to provide notice to any church or "*public, private, or parochial elementary or secondary school*"

(continued...)

secular – justification for the Zoning Code's distinction.

In order to substantially burden religion and implicate the free exercise clause, "a land use regulation . . . must be oppressive to a significantly great extent.  That is, a substantial burden on religious exercise must impose a significantly great restriction or onus upon such exercise."  Guru Nanak Sikh Society of Yuba City v. County of Sutter, 456 F.3d 978, 988-89 (9th Cir. 2006) (quoted in Vision Church v. Village of Long Grove, 468 F.3d 975, 997 (7th Cir. 2006).  Caselaw makes it very clear that "a burden must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place 'significant pressure' on [the plaintiff] to 'forego religious precepts' or to engage in 'religious conduct.'"  Vision Church, 468 F.3d at 999 (quoting  Midrash Sephardi, Inc., v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)).

Our review of the City's zoning scheme leaves us firmly convinced that no such burden has been imposed on Mr. Digrugilliers – and that, in fact, under the Code, religious land use permits entitlements that do not attend other, non-religious land uses.  Thus, Mr. Digrugilliers has failed to demonstrate a likelihood of succeeding on the merits of his free exercise claim.  See Grace Community Church v. Town of Bethel, 622 A.2d 591, 595-96 (Conn. App. 1993) (finding a similar special permit process for religious uses to be "a reasonable restriction"); Petra Presbyterian Church v. Village of Northbrook,

---

[8](...continued)
located within one thousand feet of the applicant's premises, and this phrasing is repeated in §
7.1-3-1-5.6.  These usages lead us to understand that, in all likelihood, no "schools" which may
locate as of right in a C-1 district would implicate the liquor permit restriction, as religious land
uses would.

2003 WL 22048089 at \*9-\*10 (N.D. Ill. 2003) ("[A] zoning code that merely restricts the location of religious practice and conduct does not substantially burden the free exercise of religion. . . . When churches are permitted in some municipal zoning areas but not others, a congregation does not have a constitutional right to build its house or worship in any area it chooses.").

2.     *Freedom of Speech*

Mr. Digrugilliers also asserts that the Zoning Code is unconstitutionally discriminatory based on the content of the Church's speech.  He makes three alternative arguments here: that the Code is an unconstitutional content-based restriction on the Church's religious speech; alternatively, that the Code is an unconstitutional time, place, and manner restriction; and that the Code constitutes a prior restraint by granting unbridled discretion to decision-makers.

*Content-Based Restriction*

Mr. Digrugilliers claims that the Zoning Code is content-based, and thus is subject to strict scrutiny.  See Pacific Gas and Electric Co. v. Public Utilities Comm'n of California, 475 U.S. 1, 16-17 (1986).  He bases this allegation on the fact that the prohibition of the Church's use of the premises without a variance is "activated by virtue of the religious content of the Church's speech," (Pl.'s Br. at 14) and that operationally similar uses are allowed as of right – arguing, for example, that an Irish community center

14

may assemble "to sing Danny Boy, study Gaelic texts, hold lectures thereon, and engage in charitable social efforts," but the Church is restricted from conducting similar activities because of the religious nature of its speech.  Id. at 12.

However, applicable caselaw makes clear that an ordinance such as the City's is, in fact, *not* content-based, because, though it may *incidentally* regulate speech within churches, such regulation (like the zoning ordinance at issue in CLUB) "is motivated not by any disagreement that [the City] might have with the message conveyed by church speech . . . but rather by such legitimate, practical considerations as the promotion of harmonious and efficient land use.  In this respect it is content neutral."  CLUB, 342 F.3d at 765; Petra, 2003 WL 22048089 at *9; Grace, 622 A.2d at 596.  No evidence has been submitted that indicates that the City's real motivations in promulgating the Zoning Code are to advance a hostility towards religion; indeed, the purposes in promulgation of the Zoning Code are simply those expressly stated in the Code.  And, as previously discussed, the City has good reason to seek to regulate churches in commercial zones, given the impact they have on concomitant uses and their resultant restrictions involving, for example, the area of liquor-licensing.  Thus, as in CLUB, the ordinance here is content-neutral.  See 342 F.3d at 765 (stating that the CZO "places churches on a footing equal with, if not superior to, that of nonreligious assembly uses").  All that is required is that the ordinance further a "substantial" government interest unrelated to the content of speech, and, as the CLUB court emphasized, the regulation of land use by a major population center – like Indianapolis – qualifies as such an interest.

15

*Time, Place, and Manner Restriction*

Mr. Digrugilliers next argues, in the alternative, that the ordinance constitutes an unconstitutional time, place, and manner restriction.  A time, place, and manner restriction must be narrowly tailored to serve a significant government interest, and must leave open adequate alternative avenues of communication.  See Pleasureland Museum, Inc. v. Beutter, 288 F.3d 988, 1001 (7th Cir. 2002); City of Renton v. Playtime Theaters, Inc., 474 U.S. 41 (1986).  Again, we note, the City's ordinance does serve a significant government interest, which limits our inquiry only to whether it is a narrowly tailored restriction and whether sufficient alternative avenues for speech are available.

In order to be narrowly tailored, "a regulation need not be the least restrictive or least intrusive means," but only that it further a "substantial government interest that would be achieved less effectively absent the regulation."  CLUB, 342 F.3d 765 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 798-99 (1989)).  The CLUB court found that the CZO was narrowly tailored toward the goal of land use regulation, which is the case with the Indianapolis ordinance similarly as well.  See Ward, 491 U.S. at 800 ("[T]he regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").

Further, the ordinance clearly leaves open adequate alternative avenues of communication.  Under the Zoning Code, churches are free to locate as of right in all SU-

16

1 districts (of which there are currently a total 615, of which number 44 currently have no structure on them), which are dispersed throughout the city.  Joint Stipulation ¶ 15. Because "the regulations do *not* exclude churches from the zone, but rather, require churches . . . to establish that their plans are generally compatible with residential land uses" by obtaining a use variance, we have no difficulty concluding that Mr. Digrugilliers has many adequate, alternative locations to communicate his religious  messages.  Grace, 622 A.2d at 596.  For these reasons, Mr. Digrugilliers's time, place, and manner argument is likely to falter when addressed more fully on the merits.

*Prior Restraint on Speech*

Finally, Mr. Digrugilliers protests that the Zoning Code gives "public officials the power to deny use of a forum in advance of actual expression" by operating as a prior restraint on protected speech.  Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975).  Unbridled discretion in the hands of a permit-issuing official or agency may constitute a prior restraint, because a lack of discernible standards may open the door for censorship.

Mr. Digrugilliers contends that the variance procedure the City would require him to undertake to locate in a C-1 district vests too much discretion in the BZA because the five criteria for approval of a variance petition are impermissibly vague.  We note, again, that Mr. Digrugilliers has made no attempt to secure a variance, so we assume his is a facial attack on the statute.  That said, we note as well that these criteria are enumerated

by *state* statute – not by city ordinance – at Indiana Code § 35-7-4-918.4.  Therefore,

without examining Mr. Digrugilliers's analysis of the variance procedure on its merits, we

share the City's view that his argument is misdirected since the City is not the correct

party in challenging this state-mandated procedure.  Clearly, therefore, Mr. Digrugilliers's

likelihood of success on this claim is also quite low.[9]

 

     B.    *Plaintiff's Fourteenth Amendment Claim*

     Mr. Digrugilliers contends that the Zoning Code violates the Church's right to

equal protection of the laws under the Fourteenth Amendment.  Unless a law "trammels

fundamental personal rights or is drawn upon inherently suspect classifications such as

race, religion, or alienage, our decisions presume the constitutionality of the statutory

discriminations and require only that the classifications challenged be rationally related to

a legitimate state interest."  City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976).  As

we have previously explained, the ordinance here is neutral and generally applicable,

---

[9] In addition, Mr. Digrugilliers devotes some of his brief to an analysis of the special exception process – the process by which a church may apply to locate in a *residential* zoning district.  Mr. Digrugilliers concedes that his challenge here is facial, as the Church has "not yet attempted to obtain a permit in a Dwelling district," (Pl.'s Br. at 25 n. 9) but argues that "facial challenges are permitted where a licensing scheme vests discretion in the decision maker" (quoting Weinberg v. City of Chicago, 310 F.3d 1029, 1044 (7th Cir. 2002)).  Even if true, we are unconvinced that Mr. Digrugilliers has standing to pursue such a challenge.  Though a facial challenge may be made before actually applying for a license under such a procedure, standing doctrine still requires a cognizable *injury in fact* that is *actual or imminent*.  Mr. Digrugilliers's vague pronouncements do not support standing to challenge the special exception procedure.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent injury that our cases require.'").

18

leaving only the determination of whether there is a rational basis for the law.

Mr. Digrugilliers relies heavily upon the holding in Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985), where the Supreme Court struck down a zoning ordinance that required a facility for the mentally disabled to obtain a permit, while not similarly requiring other multi-dwelling facilities to go through this process.  The Court held that the ordinance violated the equal protection clause because it was not rationally related to any legitimate government interest, because the dwelling for the mentally disabled would have essentially identical impacts on the surrounding land as would the permitted uses.  See Grace, 622 A.2d at 597.

We hold that the case at bar is easily distinguishable from Cleburne, beginning with the fact that the City has several legitimate bases for the ordinance – including the general need to regulate land use in a major metropolitan center; the need to ensure that residential and educational land uses (which may accompany religious uses as of right), and the safety, health, and aesthetic concerns which they implicate, fit into the general zoning scheme; and the need to ensure that the interests of liquor permittees are protected. These justifications, to which the zoning scheme is clearly rationally related, are more than sufficient to permit a finding that the ordinance does not violate the Fourteenth Amendment.  Compare CLUB, 342 F.3d 766 (finding that the CZO complied with the Equal Protection Clause because, as a general rule, "a zoning ordinance imposing restrictions in respect of the use and occupation of private lands in urban communities such as the segregation of residential business, and industrial buildings satisfies the

19

rational basis test as a valid exercise of authority" (internal quotation marks omitted)); see also Vision Church, 468 F.3d at 1001.

> C.    RLUIPA

Finally, we address Mr. Digrugilliers's statutory claims under RLUIPA, in which he contends that the Zoning Code violates two separate provisions: the "equal terms" provision and the "exclusion" provision.  The "equal terms" provision, at 42 U.S.C. § 2000cc(b)(1), provides that:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

The "exclusion" provision, at 42 U.S.C. § 2000cc(b)(3)(B), provides:

> No government shall impose or implement a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

Mr. Digrugilliers claims that the Zoning Code treats religious uses on less than equal terms with nonreligious institutions, based on the as-of-right permitted uses in C-1 districts which he argues are functionally similar.  Further he contends that the City "unreasonably limits" the Church by requiring it to obtain a variance, again invoking Cleburne to contend that the zoning scheme is irrational.

Because Mr. Digrugilliers's arguments under RLUIPA are substantially similar to those he advances in the constitutional context, our analysis is necessarily the same.  The Grace court noted that these two provisions of RLUIPA "codify existing Equal Protection

Clause and Free Exercise Clause jurisprudence."  2003 WL 22048089 at *11.  <u>See also</u>

<u>Freedom Baptist Church of Delaware County v. Township of Middletown</u>, 402 F.Supp.2d

857, 869 (E.D. Pa. 2002) (these provisions "codify existing Supreme Court decisions

under the Free Exercise and Establishment Clauses of the First Amendment as well as

under the Equal Protection Clause of the Fourteenth Amendment.").  Moreover, RLUIPA

"does not provide religious institutions with immunity from land use regulation, nor does

it relieve religious institutions from applying for variances, special permits or

exceptions[.]" <u>Id.</u> at *12 (quoting 146 Cong. Rec. S7776 (July 27, 2000)).  As explicated

above, Mr. Digrugilliers has not demonstrated a likelihood of prevailing on the merits on

his constitutional claims, and therefore, for those same reasons, he cannot establish a

likelihood of prevailing on the merits of his claims under RLUIPA.  <u>See</u> <u>Vision Church</u>,

468 F.3d at 988-91, 1002-03.

### III.   Conclusion

Having determined that Mr. Digrugilliers has failed to present evidence to

establish a likelihood of success on the merits, both as to his constitutional and statutory

claims, we need not address the remaining elements necessary to secure a preliminary

injunction.  <u>See</u> <u>Petra</u>, 2003 WL 22048089 at *15; <u>Clemens v. Peters</u>, 69 F.3d 539 (7th

Cir. 1995) ("The denial of a motion for a preliminary injunction may be based solely on

plaintiff's failure to establish a negligible chance of success on the merits.").  Therefore,

Plaintiff's Motion for Preliminary Injunction is <u>DENIED</u>.  IT IS SO ORDERED.

Date:    02/15/2007

_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Joshua Braden Bolinger
LANGDON & HARTMAN LLC
jbolinger@langdonlaw.com

Lakshmi Devi Hasanadka
CORPORATION COUNSEL
lhasanad@indygov.org

Herbert A. Jensen
JENSEN & ASSOCIATES
jensen@iquest.net

David R. Langdon
LANGDON & SHAFER LLC
dlangdon@langdonlaw.com

James B. Osborn
OFFICE OF CORPORATION COUNSEL
josborn@indygov.org

Jeffrey A. Shafer
ALLIANCE DEFENSE FUND
jshafer@telladf.org